# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### SOUTHEASTERN DIVISION

| | | |
|---|---|---|
| BRANDI KILLIAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:15 CV 57 DDN |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM

This action is before the court for judicial review of the final decision of the defendant Commissioner of Social Security denying the application of plaintiff Brandi Killian for disability insurance benefits (DIB) and supplemental security income benefits (SSI) under Titles II and XVI of the Social Security Act (the Act), 42 U.S.C. §§ 401, 1381. The parties have consented to the exercise of plenary authority by the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). For the reasons set forth below, the decision of the Administrative Law Judge is reversed and remanded.

## I. BACKGROUND

Plaintiff was born on March 21, 1982. (Tr. 31.) She filed her applications for DIB and SSI on October 2, 2011. (Tr. 13.) In both applications, plaintiff alleged an onset date of August 2, 2011 and alleged disability due to myasthenia gravis (MG).[1] (Tr. 35, 209.)

---

[1] Myasthenia gravis is a chronic condition that causes muscles to tire and weaken easily. It is most likely to develop in women aged between twenty and forty. Brain & Nervous System Health Center, <u>Understanding Myasthenia Gravis -- the Basics</u>, http://www.webmd.com/brain/understanding-myasthenia-gravis-basics (last visited Mar. 7, 2016).

The claim was initially denied on December 9, 2011. Thereafter, plaintiff filed a written request for a hearing before an Administrative Law Judge (ALJ) on January 18, 2012.

The ALJ held a video hearing on September 24, 2013, and on October 4, 2013, the ALJ decided plaintiff was not disabled. (Tr. 10-12.) On February 9, 2015, the Appeals Council denied plaintiff's request for review. (Tr. 21.) The decision of the ALJ is therefore the final decision of the Commissioner.

## II. MEDICAL AND OTHER HISTORY

In July and August 2011, at age 29, plaintiff was seen on several occasions in the emergency rooms at Jackson Family Care and Southeast Missouri Hospital for facial weakness and being unable to voluntarily close her eyes. (Tr. 309-10, 428-29.) She reported frequent mild headaches, blurred vision, and drooping on the left side of her face. (Tr. 358.) She reported no tingling, numbness, or muscle weakness. (Id.)

On August 2, 2011, a laboratory testing revealed that plaintiff's antibodies were markedly elevated, and she was treated by Randall Stahly, D.O., for Grave's disease.[2] (Tr. 307.) During the examination, she demonstrated significant facial and eyelid weakness, some 4/5 upper extremity weakness,[3] and normal lower extremities strength. (Id.) Plaintiff was diagnosed with MG associated with Grave's disease. (Tr. 313.) She was scheduled for a thymectomy[4] and admitted to the hospital. (Tr. 307-08, 313.)

---

[2]    Grave's disease is an immune system disorder that results in hyperthyroidism. http://www.mayoclinic.org/diseases-conditions/graves-disease/basics/definition/con-20025811 (last visited May 21, 2016).

[3] When evaluating muscle strength, physiotherapists commonly use an Oxford Scale to grade strength from zero to five, with five being full strength. A grade of 4/5 indicates that a patient has a reduced muscle strength, but contraction can still move joints against some resistance. UCSD Biochemical Genetics and Metabolomics Laboratory, Medical Research Council (MRC) Scale for Muscle Strength, http://ucsdbglab.org/Tools/MuscleScales.htm (last visited Mar. 7, 2016).

[4] Thymectomy, surgery to remove a thymoma, is typically performed to prevent the potential spread of cancer. Brain & Nervous System Health Center, Understanding Myasthenia Gravis --

On August 23, 2011, because she was diagnosed Grave's disease, elevated antibodies, and a possible thymoma,[5] revealed by a CT scan, plaintiff underwent a thymectomy. (Tr. 335.) On the following day, plaintiff had an appointment with Dr. Stahly. She had some mild bifacial weakness which had improved from two weeks before. (Tr. 311.) A motor examination demonstrated very subtle 4.5/5 weakness of the shoulder girdles with 5/5 strength in her hand grips, forearms, and lower extremities. (Id.)

On September 12, 2011, plaintiff's examination by Dr. Stahly was unremarkable. (Tr. 305.) Dr. Stahly noted that plaintiff's facial weakness had resolved, and she demonstrated no obvious axial weakness or extremity weakness. (Id.)

On September 14, 2011, plaintiff visited Randy G. Brown, M.D. The doctor found that plaintiff's pre-operative symptoms had essentially resolved, and she had no major complaints. (Tr. 295.)

On September 21, 2011, Dr. Stahly performed a follow-up examination and observed that plaintiff had responded well to her thymectomy, and that she was relatively symptom free. (Tr. 303.) Dr. Stahly released plaintiff to full duty at work as an office manager. (Id.)

On January 16, 2012, plaintiff again visited Dr. Brown, who found that plaintiff's symptoms had resolved and she had no complaints. (Tr. 491.) The physician further wrote that, overall, plaintiff was doing well, and she may resume activity as tolerated. (Id.)

On February 1, 2012, plaintiff had her first visit with Ksenija Kos, M.D., at St. John's Mercy Medical Center, Division of Neurology, who became her treating physician. Plaintiff had no symptoms of MG. (Tr. 406.) An examination revealed

the Basics, http://www.webmd.com/brain/understanding-myasthenia-gravis-basics (last visited Mar. 7, 2016).

[5] Thymoma is a tumor of the thymus, which about 15% of all MG patients have. Brain & Nervous System Health Center, Understanding Myasthenia Gravis -- the Basics, http://www.webmd.com/brain/understanding-myasthenia-gravis-basics (last visited Mar. 7, 2016).

normal muscle tone, normal fine finger movement, and 5/5 strength without atrophy. (Tr. 407.) Dr. Kos recommended that plaintiff slowly taper Prednisone[6] and restart taking Mestinon.[7] (Id.)

On March 21, 2012, plaintiff visited another physician, Charles J. Lastrapes Jr., D.O., at Cross Trails Medical Center of Cape Girardeau. Plaintiff's examination was essentially normal. Dr. Lastrapes diagnosed hyperthyroidism, allergic rhinitis, and MG without exacerbation. (Tr. 389.)

On April 5, 2012, plaintiff returned to Dr. Kos. For the first time after her thymectomy, plaintiff reported mild facial and tongue weakness. (Tr. 404.) Muscle tone was normal, the physician diagnosed a 5/5 strength without atrophy, and normal fine finger movements. (Id.) The physician recommended that plaintiff continue her current dose of Prednisone and start taking CellCept.[8] (Tr. 405.)

Plaintiff visited Dr. Lastrapes on May 16, 2012 complaining of symptoms. She reported fatigue, blurred vision, headaches, etc. (Tr. 380-81.) The physician diagnosed hyperthyroidism and MG without exacerbation. (Id.)

On August 6, 2012, plaintiff visited Dr. Kos and reported mild weakness of tongue and throat muscles, and intermittent mild difficulty swallowing. (Tr. 401.) Upon examination, plaintiff had mild facial weakness, but had full muscle strength and normal fine finger movements. (Id.) Dr. Kos recommended a continued decreased dose of Prednisone and an increased dose of CellCept. (Tr. 402.)

---

[6] Prednisone is an oral steroid medication used to calm airway inflammation in a patient's asthma. Asthma Health Center, Prednisone and Asthma, http://www.webmd.com/asthma/guide/prednisone-asthma (last visited Mar. 7, 2016).

[7] Mestinon is used to improve muscle strength in patients with MG. It works by preventing the breakdown of a certain natural substance in the patient's body. WebMD, Drugs & Medications: Mestinon, http://www.webmd.com/drugs/2/drug-3740/mestinon-oral/details (last visited Mar. 7, 2016).

[8] CellCept is a medication most commonly used in MG to suppress the immune system. Brain & Nervous System Health Center, How Is Myasthenia Gravis Diagnosed and Treated? http://www.webmd.com/brain/understanding-myasthenia-gravis-treatment (last visited Mar. 7, 2016).

Plaintiff returned to Dr. Lastrapes on September 5, 2012. She reported being tired all of the time, insomnia, and fatigue. (Tr. 376.) She also reported having difficulty sleeping at night with increased headaches, even with the Ambien. (Id.) The doctor repeated his diagnoses, and prescribed Ritalin,[9] CellCept, and Prednisone. (Tr. 378.)

On February 11, 2013, upon examination by Dr. Kos, plaintiff was diagnosed with bilateral 4/5 proximity muscle weakness along with moderate facial weakness. (Tr. 399.) The doctor prescribed IVIg[10] and stated that Ritalin helped plaintiff's fatigue. (Tr. 400.) During another visit with Dr. Kos on March 20, 2013, plaintiff was again diagnosed with proximity muscle weakness and moderate facial weakness, but was also reported she benefitted from IVIg and Ritalin. (Tr. 395-97.)

At Dr. Kos's recommendation, plaintiff received infusions to treat her MG symptoms. On May 26, 2013, plaintiff received an infusion, and reported increased symptoms of blurred vision, throat weakness, and fatigue. (Tr. 441-43.) On June 26, 2013, a second infusion was performed. Plaintiff again reported continued blurred vision, daily weakness, and fatigue. (Tr. 436-38.)

On July 11, 2013, Dr. Kos completed a medical source statement and a MG questionnaire. Dr. Kos opined that plaintiff could lift and carry five pounds frequently and fifteen pounds occasionally; stand and walk for one hour; and, sit for one hour during an eight-hour workday. (Tr. 409.) She had no difficulty pushing or pulling, but she could never climb, stoop, or crawl. (Tr. 409-10.) She could occasionally balance, kneel, crouch, reach, and handle objects. (Tr. 410.) She should avoid moderate exposure to extreme cold and heat, and avoid any exposure to hazards or heights. (Id.) It was unknown to the physician whether plaintiff needed to lie down or recline during the day,

---

[9] Ritalin is used to treat attention deficit, it helps to increase a patient's ability to concentrate, it is also used to treat certain sleep disorders. WebMD, Drugs & Medications: Mestinon, http://www.webmd.com/drugs/2/drug-9475/ritalin-oral/details (last visited Mar. 7, 2016).

[10] IVIg is intravenous immunoglobulin. In severe cases, a MG patient will be prescribed IVIg, which helps the patient with a weakened immune system fight off infections. WebMD, Drugs & Medications: IVIg, http://www.webmd.com/a-to-z-guides/immunoglobulin-therapy (last visited Mar. 7, 2016).

but he opined that plaintiff would experience a decrease in concentration, persistence, pace, or other limitations "during exacerbation." (Id.) (Dr. Kos did not explain or specify what he meant by "exacerbation.") In the MG questionnaire, Dr. Kos stated that plaintiff had muscle weakness of her face, legs, and arms. (Tr. 412.) The physician further opined that due to her MG, plaintiff had substantial muscle weakness during repetitive activity, and she could not sustain work throughout a normal work day or week because of her daily fatigue and weakness. (Id.)

Upon examination on September 16, 2013, Dr. Kos stated that plaintiff was doing well. (Tr. 495.) Despite this, the physician still diagnosed 4/5 proximity muscle weakness and moderate facial weakness. (Tr. 497.) It was further noted that plaintiff did not tolerate IVIg well, the benefits from the infusion did not last long, and she developed severe headaches. (Tr. 495.)

On August 27, 2014, Dr. Kos finished another medical source statement and a migraine questionnaire. The physician opined that due to her muscle weakness, facial weakness, throat weakness, blurred vision, and fatigue, plaintiff's ability to work was limited. (Tr. 516-18.) According to the statement, plaintiff could rarely lift twenty pounds and only occasionally lift ten pounds. She could never stoop, crawl, or climb. She could rarely twist, balance, or crouch. (Tr. 517.) She had no limitation in reaching or handling objects. But the doctor stated that plaintiff could sit less than two hours and stand one hour during an eight-hour workday. (Id.) In the migraine questionnaire, the doctor wrote that plaintiff's migraines were generally controlled with medication. (Tr. 517.) She could not function in a work setting when a migraine headache occurred, which could happen as often as once a week or as infrequently as once a month. Plaintiff could return to work in two to five days after a migraine. (Id.)

### III. ALJ HEARING

The ALJ held a video hearing on September 24, 2013. (Tr. 13, 29.) Plaintiff attended the hearing with her counsel and testified to the following facts. (Tr. 29-47.) She was at the time 31 years old and weighed 175 pounds. (Tr. 31.) She lived with her

husband and her child, aged five. (Id.) She completed two years of college. (Id.) Plaintiff had a driver's license, and she drove to the hearing from her home, which was less than a mile away. (Tr. 32.) She did not report any difficulty in making the trip at the time, but at times she had blurred vision which caused problems with driving. (Id.)

Plaintiff used to work for an insurance company as a full-time office manager before August 2011. (Tr. 32-33.) At that time, plaintiff's symptoms began. She had no movement in the left side of her face, had difficulty closing her eyes, and had blurred vision. (Tr. 34.) She experienced muscle weakness and was unable to walk up or down steps. She had difficulty making phone calls because of muscle weakness in her throat. (Id.) Plaintiff was diagnosed with MG and underwent surgery. (Id.) After spending about a month in the hospital following her surgery, plaintiff returned to work. (Tr. 33.)

However, plaintiff's symptoms resumed. She first switched to a part-time position within the same insurance company, but the stress of working caused more MG symptoms. (Tr. 35.) In November 2011, she resigned from the insurance company, and started working for another company's accounting department, which was a less stressful job. (Tr. 33.) Plaintiff's throat weakness and blurred vision increased in severity. She also experienced weakness in her legs and arms. In May 2012, plaintiff stopped working. (Tr. 33-35.)

Plaintiff stated that after stopping working, she stayed at home, took care of her child, and did some house work and the laundry. (Tr. 36.) Her husband helped her to take the laundry downstairs because her muscles were too weak to lift it. She tired easily, and needed to sit or take naps while doing housework. (Id.) Plaintiff had difficulty holding and turning a steering wheel, and had little strength carrying objects over ten pounds. (Id.) When plaintiff had fatigue in her extremities, she could do no activity for more than thirty minutes. This happened about four days a week. (Tr. 37.) Plaintiff also stated that, due to her fatigue, she had difficulty concentrating. The blurred vision occurred every day. (Tr. 39.) In answering the ALJ's question, plaintiff stated that she was able to cook, and she would attend her son's school activities from time to time. (Tr. 42-43.)

A Vocational Expert (VE) testified regarding the availability of work for a person with plaintiff's various limitations. (Tr. 45-47.) The ALJ described a hypothetical person, aged thirty one, with the same education and past work experiences as plaintiff, who could frequently lift ten pounds; walk or stand two hours out of an eight-hour workday; and, sit for six hours out of an eight-hour workday. Additionally, the person could occasionally climb stairs, but she could never climb ropes, scaffolds, and ladders. She could occasionally stoop, crouch, kneel, and crawl. Furthermore, the person could occasionally push and pull. She should avoid prolonged exposures to temperature extremes and humidity, and should also avoid heights, hazardous objects, and moving machineries. She was also limited to jobs that would not demand attention to detail or complicated instructions. The VE testified that this person could return to a receptionist's position. (Tr. 45.) In a second hypothetical question, the ALJ added additional restrictions that she was limited to simple instructions. The VE testified that she would not be able to do a receptionist's job, but this person could perform work in the national and local economies. (Tr. 45-46.) The ALJ further added additional limitations on the hypothetical person, that she was limited to occasional reaching and handling. The VE responded that this would preclude all jobs for the person. (Tr. 46.)

Plaintiff's attorney added additional restrictions on the ALJ's first hypothetical person, that she would on average leave early, or miss work for two to three days a month due to health impairments. (Id.) The VE testified that there would be no job for the person. (Id.) In answering plaintiff's attorney's question, the VE further testified that absence due to sickness would be limited to one day per month. (Id.)

## IV. DECISION OF THE ALJ

On October 4, 2013, the ALJ found plaintiff not disabled. (Tr. 13.) At the First Step, of the required 5-step analytic process, the ALJ found that plaintiff had not been engaged in substantial activity since August 2, 2011, the alleged onset date. (Tr. 15.)

At Step Two the ALJ found plaintiff had one severe impairment, myasthenia gravis (MG). (Id.)

At Step Three the ALJ found plaintiff did not have an impairment that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. § 416.920(d), § 416.925 and § 416.926). (Tr. 16.) The ALJ considered plaintiff's MG and opined without detailed analysis that, while plaintiff was on prescribed therapy, there was no evidence of significant difficulty with speaking, swallowing, or breathing, and no evidence of significant motor weakness of muscles of extremities during repetitive activity with resistance. (Id.)

The ALJ then considered the record and determined that plaintiff had the residual functional capacity (RFC) to perform sedentary work as defined in 20 C.F.R. § 404.1567(a) and 416.967(a). Plaintiff can lift and carry ten pounds frequently; sit for six hours out of an eight-hour workday; and stand and walk for two hours out of an eight-hour workday. (Tr. 16.) In his decision, the ALJ stated nothing about his own observation of plaintiff, but instead relied on plaintiff's medical records and her testimony. The ALJ formed his conclusion on two grounds: plaintiff's testimony was not entirely credible (Tr. 17), and plaintiff's treating physician's opinions were entitled to minimal weight. (Tr. 19.)

First, the ALJ opined that plaintiff's allegation of her significant impairments was not supported by her medical records. (Tr. 17.) The ALJ stated that plaintiff never reported to any treatment provider having significant muscle weakness. Furthermore, her treating physician never documented significant muscle weakness in her extremities. (Tr. 17-18.)

Second, the ALJ gave minimal weight to plaintiff's treating physician's opinions because they were inconsistent with the records. (Tr. 19.) The ALJ reasoned that the treating physician's notes contained no notation of plaintiff's significant weakness, the physician generally noted that plaintiff was doing well, and she was able to complete some daily activities. (Id.)

At Step Five the ALJ, with the testimony of a VE, found that plaintiff was unable to perform any past work. (Id.) After considering plaintiff's medical record and testimony, the ALJ found work in significant numbers in the national economy that

plaintiff could perform. (Tr. 20.) Subsequently, the ALJ found that plaintiff was not disabled. (Id.)

## V. GENERAL LEGAL PRINCIPLES

The court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings comply with the relevant legal requirements and are supported by substantial evidence in the record as a whole. Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Id. In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision. Id. As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently. See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove that she is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A), 1382c(a)(3)(A); Pate-Fires, 564 F.3d at 942. A five-step regulatory framework is used to determine whether an individual is disabled. 20 CFR § 404.1520(a)(4); see also Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987) (describing the five-step process); Pate-Fires, 564 F.3d at 942 (same).

Steps One through Three require the claimant to prove (1) she is not currently engaged in substantial gainful activity, (2) she suffers from a severe impairment, and (3) her disability meets or equals a listed impairment. 20 C.F.R. § 404.1520(a)(4)(i)-(iii). If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to Steps Four and Five. Step Four requires the Commissioner to consider whether the claimant retains the RFC to perform her past

relevant work (PRW). Id. § 404.1520(a)(4)(iv). The claimant bears the burden of demonstrating she is no longer able to return to her PRW. Pate-Fires, 564 F.3d at 942. If the Commissioner determines the claimant cannot return to PRW, the burden shifts to the Commissioner at Step Five to show the claimant retains the RFC to perform other work that exists in significant numbers in the national economy. Id.; 20 C.F.R. § 404.1520(a)(4)(v). In this case, the ALJ found plaintiff could not perform her past relevant work, but found there was other work she could perform.

## VI. DISCUSSION

Plaintiff argues that the ALJ: (1) failed to give proper weight to the opinions of plaintiff's treating physician, Dr. Kos; (2) erred in discrediting plaintiff's subjective complaints, and (3) failed to provide a sufficient narrative statement in support of the ALJ's RFC finding.

### A. Treating Physician's Opinion

Plaintiff argues that the ALJ erred by giving only minimal weight to the opinions of plaintiff's treating physician, Dr. Kos. (Pl.'s Br. 7.) The court disagrees.

A treating physician's opinion is entitled to controlling weight regarding "the nature and severity of a claimant's impairments," if it is well-supported by acceptable diagnostic procedures and is "not inconsistent with other substantial evidence." Romine v. Colvin, 609 F. App'x 880 (8th Cir. 2015) (quoting Cline v. Colvin, 771 F.3d 1098, 1103 (8th Cir. 2014)). Such controlling weight, however, is neither inherent nor automatic. Cline, 771 F.3d at 1103. The Commissioner "may discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." Id., (quoting Anderson v. Astrue, 696 F.3d 790, 793 (8th Cir. 2012)). The Commissioner must always give good reasons for the weight she gives. Id.

The ALJ provided good reasons for giving minimal weight to Dr. Kos's opinions. First, Dr. Kos's treatment notes did not contain "any notations of the claimant having significant weakness." (Tr. 19.) Although Dr. Kos documented some mild upper extremity weakness, there was no notation of any treatment for either upper or lower extremities. (Id.) Second, Dr. Kos generally noted that plaintiff was doing well. (Id.) Third, Dr. Kos's opinion was inconsistent with plaintiff's reported daily activities. (Id.)

Plaintiff started her visits with Dr. Kos in February 2012. Before February 2013, however, neither plaintiff nor Dr. Kos reported significant muscle weakness in plaintiff's extremities. (Tr. 401-06.) Between February 2013 and September 2013, the time of the ALJ hearing, plaintiff had three visits with Dr. Kos. Upon each visit, the physician noted that plaintiff had "muscle weakness of was +4/5 in proximal [upper extremities] muscles bilaterally." (Tr. 396, 399, 497.) As the ALJ lawfully pointed out, however, Dr. Kos prescribed no medication specifically addressing lower extremity muscle weakness. (Id.) The physician prescribed CellCept and IVIg on each occasion, and added Prednisone upon the last visit. (Id.) CellCept and Prednisone are commonly prescribed to treat immune system disorders and MG, physicians also prescribe IVIg for immune system problems.[11] The descriptions of said treatments, however, bear no specific indication of muscle weakness treatment. Notably, Dr. Kos wrote in her treatment plan on September 16, 2013 that "[s]he is currently on CellCept to 1500 mg po bid – but she still has facial weakness." (Tr. 497.) While the physician emphasized facial weakness, he was silent on lower extremity weakness. (Tr. 396, 399, 497.)

Plaintiff argues that Dr. Kos opined that plaintiff was unable to work because of "fatigue and weakness on a daily basis" instead of "significant weakness." (Pl.'s Br. 8.) Plaintiff further argues that "[t]he fact that her treatment records do not document weakness during a brief examination does not suggest that [plaintiff] did not experience substantial weakness with repetitive activity." (Id.) The court disagrees. The question at

[11] Brian & Nervous System Health Center, Diagnosis & Treatment of Myathenia Gravis, WebMD, http://www.webmd.com/brain/understanding-myasthenia-gravis-treatment (last visited Feb. 8, 2016).

issue here is whether Dr. Kos's treatment was consistent with her conclusion, and therefore whether or not the ALJ should have given it controlling weight.

During the nineteen months Dr. Kos treated her, plaintiff was diagnosed with mild muscle weakness on three occasions. (Tr. 396, 399, 497.) "An 'ALJ [is] not required to give controlling weight to a treating physician's opinion where substantial evidence in the record . . . [is] inconsistent with [the treating physician's] own treatment notes and other relevant evidence." Romine, 609 F. App'x at 886 (quoting Perkins v. Astrue, 648 F.3d 892, 899 (8th Cir. 2011)). Had Dr. Kos diagnosed plaintiff's muscle weakness as significant, she would have prescribed treatment commensurate with that level. Dr. Kos emphasized facial weakness in her treatment notes, but did not do the same for the extremity weakness.

Although the ALJ is responsible for determining RFC based on all relevant evidence in the record, plaintiff bears the burden of establishing disability. Harris v. Barnhart, 356 F.3d 926, 930 (8th Cir. 2004); 42 U.S.C. § 404.1520(a). Plaintiff had adequate opportunity to provide affidavits, testimonies, or other evidence to clarify the physician's muscle-weakness treatment, but she failed to do so.

The ALJ also discounted Dr. Kos's opinion also because she noted that plaintiff was "doing well" on one occasion. (Tr. 19, 495.) She was diagnosed of only 4/5 weakness, meaning "some reduced muscle strength." (Tr. 399.) On several occasions, she had "full muscle strength and normal fine finger movements." (Tr. 401, 497.) Plaintiff is correct to argue that a general comment of doing well does not mean that plaintiff is not disabled. (Pl.'s Br. 8-9.) But the question is again whether the inconsistency in the medical record supports the ALJ's rejection of Dr. Kos's opinions. The court believes it does.

Dr. Kos made the "doing-well" comment in the examination of plaintiff on September 16, 2013, a week before the ALJ hearing. (Tr. 495.) In this medical record, Dr. Kos maintained most of her previous diagnoses and prescriptions, adding two comments: (1) plaintiff had been doing well since her last visit, and (2) plaintiff did not tolerate IVIg well, and the benefits from the infusion did not last long. (Id.) Two

reasonable inferences could be made from this record: (1) plaintiff was recovering from her symptoms, despite of some side effects; or (2) plaintiff's symptoms developed and she suffered more from them. The ALJ made a reasonable choice between the two, based on substantial evidence, that plaintiff was recovering. There is no substantial basis for disturbing the ALJ's decision. See Goff v. Barnhart, 421 F.3d 785, 789 (8th Cir. 2005) ("If, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision.")

Finally, the ALJ discounted Dr. Kos's opinions because of plaintiff's reported daily activities. (Tr. 19.) In the ALJ hearing, plaintiff testified that she was able to cook, clean, shop, do laundry, and take care of her child. (Tr. 36-43.) She attended her son's school activities and she can drive. (Id.) On the other hand, plaintiff also testified that she had difficulty lifting the laundry; her husband had to help her with shopping and cooking; she would easily feel tired when performing housework; and she had to take naps often. (Id.) This testimony reveals both plaintiff's capabilities to perform daily activities and limitations she faced. The ALJ considered this when stating plaintiff "may not be able to engage in all of the activities" and "it may take her longer to perform the tasks." (Tr. 18-19.)

Furthermore, Dr. Kos's medical source statement on July 11, 2013, states that plaintiff could stand and walk one hour in a workday, but she could never climb. (Tr. 409-10.) Plaintiff's testimony, however, indicated that she was able to climb up and down the stairs when doing laundry. (Tr. 37-38.) It is also unclear from her testimony how many hours plaintiff was able to stand and walk in a day, but she also testified that it took her all day to vacuum three rooms, indicating she could walk and push, even if it required sitting from time to time. (Tr. 41.)

Substantial evidence supports the ALJ's decision to give Dr. Kos's opinion minimal weight.

## B. Plaintiff's Credibility

Plaintiff argues that the ALJ's credibility determination was not supported by substantial evidence because the ALJ failed to explain how plaintiff was not credible regarding her limitations.  (Pl.'s Br. 13.)  The court disagrees.

In evaluating a plaintiff's subjective symptoms using the <u>Polaski</u> factors, the ALJ must make a credibility determination.  <u>See</u> <u>Polaski v. Heckler</u>, 739 F.2d 1322 (8th Cir. 1984); <u>see also</u> <u>Ellis v. Barnhart</u>, 392 F.3d 988, 995-96 (8th Cir. 2005).  These factors include: (1) the plaintiff's daily activities; (2) the duration, frequency, and intensity of the condition; (3) dosage, effectiveness, and side effects of medication; (4) precipitating and aggravating factors; and (5) functional restrictions.  <u>Polaski</u>, 739 F.2d at 1322.  The ALJ does not need to discuss each factor separately.  Rather the court will review the record as a whole to ensure such evidence was not disregarded by the ALJ.  <u>See</u> <u>McCoy v. Astrue</u>, 648 F.3d 605, 615 (8th Cir. 2011); <u>see also</u> <u>Dunahoo</u>, 241 F.3d at 1039 ("If the ALJ discredits a claimant's credibility and gives a good reason for doing so, we will defer to its judgment even if every factor is not discussed in depth.").  Subjective complaints may be discounted if there are inconsistencies in the record as a whole.  <u>Polaski</u>, 739 F.2d at 1322; <u>see also</u> <u>Medhaug v. Astrue</u>, 578 F.3d 805, 817 (8th Cir. 2009) ("[A]cts such as cooking, vacuuming, washing dishes, doing laundry, shopping, driving, and walking, are inconsistent with subjective complaints of disabling pain."); <u>McDade v. Astrue</u>, 720 F.3d 994, 998 (8th Cir. 2013) (The ALJ discounted plaintiff's credibility when the evidence showed that plaintiff "was not unduly restricted in his daily activities, which included the ability to perform some cooking, take care of his dogs, use a computer, drive with a neck brace, and shop for groceries with the use of an electric cart.").

The ALJ may reject plaintiff's complaints of pain as not credible, but in doing so must give legally sufficient reasons, by citing inconsistencies in the record and discussing the <u>Polaski</u> factors.  <u>Singh v. Apfel</u>, 222 F.3d 448, 452 (8th Cir. 2000); <u>see</u> <u>Kisling v. Chater</u>, 105 F.3d 1255, 1257 (8th Cir. 1997) (impairments which may be controlled with treatment, including certain respiratory problems, do not support a finding of disability,

and failure to follow a prescribed treatment, including the cessation of smoking, without good reason is grounds for denying an application for benefits).

The ALJ formed his credibility opinion on three grounds. First, plaintiff never reported any significant muscle weakness in her extremities to any physician. (Tr. 17-18.) Second, plaintiff's alleged significant medical limitations due to fatigue were not fully supported. (Tr. 18.) Third, plaintiff was able to perform many daily activities, which ability was inconsistent with her alleged limitations due to significant pain. (Tr. 18-19.)

Substantial evidence supports the ALJ's finding that plaintiff never reported significant muscle weakness. On several occasions, plaintiff's medical record shows mild muscle weakness in her extremities. For instance, in August 2011, Dr. Stahly documented that plaintiff had some "mild shoulder girdle weakness." (Tr. 311.) From February to September 2013, Dr. Kos noted that plaintiff had +4/5 muscle strength in her upper extremities. (Tr. 399, 396, 409, 495, 516.) Given the fact that no physician explicitly documented plaintiff's significant muscle weakness, or described her fatigue as significant, the ALJ's first ground is supported by substantial evidence.

Next, the ALJ discussed how the medical record failed to support plaintiff's allegation of significant physical limitations. "The ALJ may discredit subjective complaints of pain only if they are inconsistent with the evidence on the record as a whole." Delrosa v. Sullivan, 922 F.2d 480, 485 (8th Cir. 1991). The whole medical record should be taken into consideration, Pate-Fires, 564 F.3d at 942. The ALJ reviewed the medical record as a whole, and considered relevant notations, such as that plaintiff was diagnosed only +4/5 muscle weakness in her upper extremities, that plaintiff benefitted from the treatments, and that the treating physician never documented any significant weakness in plaintiff's lower extremities, as she claimed. (Tr. 18.)

Finally, the ALJ discredited plaintiff because her subjective complaints were inconsistent with her daily activities. "[W]here an ALJ rejects a claimant's testimony regarding pain, he must make an express credibility determination detailing his reasons

for discrediting the testimony." <u>Delrosa v. Sullivan</u>, 922 F.2d 480, 485 (8th Cir. 1991) (quoting <u>Prince v. Brown</u>, 894 F.2d 283, 286 (8th Cir. 1990)).

Plaintiff's testimony regarding her limitations in daily life is inconsistent with the muscle weakness she complaints of. The ALJ found that plaintiff's muscle weakness was "mild" and not supportive of her allegation of significant weakness. (Tr. 18.) Furthermore, the ALJ stated that plaintiff's "activities [were] not limited to the extent one would expect." (Tr. 18.) The court agrees. Dr. Kos's physical examination notes show that plaintiff had muscle weakness in her upper extremities, and she was unable to work due to her symptoms. Dr. Kos further documented that plaintiff was significantly limited to perform housework, shop, or drive. (Tr. 399, 396, 409, 495, 516.) Plaintiff's testimony, however, indicates her ability to perform a variety of daily activities. As discussed before, plaintiff testified to both the activities she was and was not able to perform. The ALJ's opinion demonstrates substantial reasons to question plaintiff's credibility. The ALJ specified facts that plaintiff was able to cook and clean, she was able to take care of her child and attend his school activities, she was able to do laundry and shopping, with her husband's help, and she was able to drive. (Tr. 18-19.) After summarizing plaintiff's daily activities, the ALJ held that "she [was] more active than would be expected if all of her allegations were credible." (Tr. 19.)

The court finds that substantial evidence supports the ALJ's decision to discredit plaintiff's subjective complaints.

## C. Plaintiff's RFC

Plaintiff further argues that the ALJ's determination regarding her RFC to perform sedentary work was erroneous because the ALJ provided no evidentiary record to sustain his RFC finding. (Pl.'s Br. 12.)

The RFC is what a plaintiff can do despite her limitations, which is to be "determined on the basis of all relevant evidence, including medical records, physician's opinions, and claimant's description of her limitations." <u>Dunahoo v. Apfel</u>, 241 F.3d

1033, 1039 (8th Cir. 2001); 20 C.F.R. § 404.1545(a)(1); see 20 C.F.R. § 416.929 ("In determining whether you are disabled, we consider all your symptoms, including pain, and the extent to which your symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence.").  It is the plaintiff's burden to prove her RFC, while the ALJ is responsible for determining RFC based on all relevant evidence in the record.  See Harris v. Barnhart, 356 F.3d 926, 930 (8th Cir. 2004).

The ALJ has the duty to provide "a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts . . . and nonmedical evidence."  Social Security Ruling 96-8p, 1996 WL 374184, at *7.  A summary of the medical record does not fulfill the narrative discussion requirement.  George v. Astrue, No. 4:10 CV 02136 RWS/NAB, 2012 WL 1032973, at *14 (E.D. Mo. Mar. 5, 2012).  The ALJ, however, is not required to make explicit findings for every aspect of the RFC.  Depover v. Barnhart, 349 F.3d 563, 567 (8th Cir. 2003).  The ALJ has no obligation to obtain additional medical evidence, if other evidence in the record provides a sufficient basis for the decision.  Kamann v. Colvin, 721 F.3d 945, 950 (8th Cir. 2013).  Where the evidence in the record is insufficient, however, the ALJ must have other medical evidence to support the RFC assessment.  Brown v. Colvin, No. 4:13 CV 01693 SPM, 2014 WL 2894937, at *6 (E.D. Mo. June 26, 2014).

Here, the ALJ provided no specific explanation or medical opinion how the evidence supported his conclusion that plaintiff could maintain a sedentary RFC.  The ALJ started his discussion regarding plaintiff's RFC by discrediting plaintiff's subjective complaints.  (Tr. 17-19.)  Following which, the ALJ discredited Dr. Kos's opinion regarding plaintiff's limitations.  (Tr. 19.)  The ALJ then concluded that plaintiff had the RFC to perform sedentary work, without citing any other medical opinion.  (Tr. 16.)

Plaintiff correctly argues that "[a]fter discounting Dr. Kos's opinions, the record was left undeveloped regarding [plaintiff's] functional abilities."  (Pl.'s Br. 11.)  After discrediting plaintiff's complaints and Dr. Kos's opinions, what remains is nothing more than a minimally weighted treating physician's opinion.  Although the ALJ briefly summarized plaintiff's daily activities, there was no adequate basis for the ALJ's finding.

Where the ALJ failed to cite other medical opinions, he acted as a evaluating physician himself.

The court agrees with the Commissioner that plaintiff bears the burden of providing evidence, (Def.'s Br. 19,) and that the ALJ did not dismiss Dr. Kos's opinion "in its entirety." (Id.) This argument, however, masks the insufficiency of the basis for the ALJ's finding. Plaintiff provided evidence about her limitations, namely, Dr. Kos's opinions. The ALJ, on the other hand, sought no other medical opinion, despite of the fact the he gave minimal weight to Dr. Kos's opinions, and mentioned no conflicting medical evidence in the record. No evidence supports the ALJ's RFC opinion. See Leise v. Astrue, No. 4:06 CV 196 DDN, 2007 WL 5117110, at *8 (E.D. Mo. Feb. 26, 2007) (holding that the ALJ must have some evidence to support her RFC findings, even if the ALJ has lawfully rejected claimant's evidence).

Defendant argues that the ALJ properly considered plaintiff's medical record. The court disagrees. The ALJ determined that plaintiff was able to "sit for six hours out of an eight-hour workday, and stand and walk for two hours out of an eight-hour workdays." (Tr. 16.) Dr. Kos, however, opined that plaintiff was able to sit for one hour, and stand and walk for one hour out of a workday. (Tr. 409.) Even if the ALJ gave minimal weight to Dr. Kos's opinion, he failed to provide any evidence to support his finding that plaintiff was able to sit for six hours a day instead of only one. The court, therefore, finds that the ALJ's decision regarding plaintiff's RFC is not supported by substantial evidence.

Furthermore, the ALJ failed to consider plaintiff's other significant limitations. For instance, in answering plaintiff's attorney's question, the VE testified that a person in the ALJ's hypothetical would not remain employed if she is absent from work for more than one day per month. (Tr. 46.) Plaintiff's medical record shows, however, that she was prescribed IVIg infusions on a monthly basis, which resulted in severe headaches. (Tr. 495.) Following each infusion, plaintiff reported increased symptoms of blurred vision, throat weakness, and fatigue. (Tr. 436-38, 441-42.) Dr. Kos also opined that plaintiff's migraine headaches would occur with widely varying frequency, and plaintiff

was unable to work for two to five days afterwards. (Tr. 519.) This indicates that plaintiff might be absent longer than acceptable to maintain employment. The ALJ's opinion, however, mentioned nothing about such potential limitation.

The court therefore, finds that the ALJ's decision regarding plaintiff's RFC is not supported by substantial evidence.

### D. Step Three Determination

The court notes that the ALJ's consideration of the Step Three required analysis is legally insufficient. The court may review the issue *sua sponte*. See Miles v. Colvin, 973 F. Supp. 2d 1030, 1043 (E.D. Mo. 2013) (quoting Battles v. Shalala, 36 F.36 43, 45 n. 2 (8th Cir. 1994)).

Under the five-step regulatory framework, the ALJ must consider whether plaintiff's impairment meets or equals a listed impairment. Bowen v. Yuckert, 482 U.S. 137, 140-142 (1987); 20 C.F.R. § 404.1520(a)(4)(i)-(iii). "If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be disabled." Bowen, at 142.

The listing for myasthenia gravis provides two situations where a claimant's symptoms meet its requirements for a conclusive disability finding:

> 11.12 *Myasthenia gravis*. With:
> A. Significant difficulty with speaking, swallowing, or breathing while on prescribed therapy; or
> B. Significant motor weakness of muscles of extremities on repetitive activity against resistance while on prescribed therapy.

Listing 11.12, 20 C.F.R. Part 404, Subpart P, Appendix 1.

The ALJ's decision has a very brief summary discussion of Step Three. The ALJ concluded that plaintiff's condition did not meet Listing 11.12 (MG) as there was "no evidence of significant difficulty with speaking, swallowing, or breathing while on prescribed therapy and no evidence of significant motor weakness of muscles of extremities on repetitive activity against resistance while on prescribed therapy." (Tr. 16.)

While it is within the ALJ's authority to discredit or disregard evidence, he must at least state a legitimate basis for his finding.  See George v. Astrue, 4:10 CV 02136 RWS NAB, 2012 WL 1032973, at *14 (E.D. Mo. Mar. 5, 2012).  Plaintiff introduced evidence of her difficulty with swallowing.  She testified in the ALJ hearing that she had to resign from the insurance company because she was unable to talk to customers due to the weakness in her throat.  (Tr. 35.)  She suffered from the same symptom while she was working as a part-time accountant.  (Id.)  Dr. Kos repeatedly diagnosed that she had throat weakness.  (Tr. 401, 436-38, 441-43, 516-18.)  There is also evidence in the record that plaintiff had motor weakness of muscles of her extremities, from both plaintiff's own testimony, and from Dr. Kos's notes.  (Tr. 34-42, 396-400, 412.)  In his opinion, the ALJ gave no substantial basis for discrediting plaintiff's testimony *in this regard*.

Therefore, the ALJ's brief, conclusory discussion of Step Three is legally insufficient and requires reversal and remand.

## VI. CONCLUSION

For the reasons set forth above, the decision of the Commissioner of Social Security is reversed under Sentence 4 of 42 U.S.C. § 405(g) and remanded for further proceedings.  The court instructs that on remand (1) the ALJ must reconsider the Step Three determination and, regardless of the decision on this issue, provide a legally sufficient narrative discussion, and (2) the ALJ must reassess plaintiff's RFC, considering the relevant medical record and other evidence; if needed, the ALJ must acquire a consulting medical opinion to on the plaintiff's RFC.

An appropriate Judgement Order is issued herewith.


_____/S/ David D. Noce_____
**UNITED STATES MAGISTRATE JUDGE**


Signed on May 24, 2016.